WILLIAM T. WRIGHT AND LYNNE L. WRIGHT, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Wright v. Commissioner
Docket Nos. 1000-90, 18407-90, 27968-90, 26402-91
United States Tax Court
T.C. Memo 1993-328; 1993 Tax Ct. Memo LEXIS 332; 66 T.C.M. (CCH) 214; July 26, 1993, Filed Decision will be entered under Rule 155. For petitioners: Stephen H. Boyle, Norman H. Lane, and Frank E. Merideth, Jr.
For respondent: Terri A. Merriam and Christopher D. Hatfield. COHEN
COHEN
MEMORANDUM FINDINGS OF FACT AND OPINION COHEN, Judge: In these consolidated cases, respondent determined deficiencies in and additions to petitioners' Federal income taxes as follows: WILLIAM T. AND LYNNE L. WRIGHT
Additions to Tax Docket
Sec.
Sec.
No.
Year
Deficiency
6621(c) Negligence
[2] Fraud 6661
Increased
interest on:
26402-91
1983
$ 30,558 $ 30,558 --  $ 15,279 $ 7,640  26402-91
1984
194,098
194,098
--  97,049
48,525
1000-90 1985
414,891
393,246
--  207,446
103,723
27968-90
1986
383,958
383,958
[1] $ 8,280
163,768
95,990
26402-91
1987
49,067
49,067
--  36,800
12,267
W-T-W, INC. (DOCKET NO. 18407-90)
Additions to Tax
Year Sec. Ended
Deficiency
Negligence
Fraud
6661 8/31/86
$ 255,202
-- $ 127,601
$ 63,801
8/31/87
236,737
[1] *333 $ 8,242
53,930
59,184 In addition, for 1983 through 1987, respondent determined additions to tax equal to 50 percent of the interest due on the portions of the deficiencies attributable to fraud or negligence. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. After concessions, the issues presented for decision are: (1) Whether income from the sale of insurance policies by automobile dealerships owned by William T. Wright (Wright), which petitioners allocated to First Interstate Re, Ltd. (FIR), should be allocated to petitioners, or whether Wright is deemed to have received constructive dividends from FIR; (2) whether overpayments made by the Wright dealerships to service contract administrators, which were forwarded to FIR and which petitioners concede should be allocated to the Wright dealerships under section 482, are taxable to petitioners; (3) whether the interest earned on overpayments placed in the FIR bank account is taxable to petitioners; (4) whether amounts placed in annuities were owned *334 by the Wright dealerships, and whether such amounts plus interest thereon are taxable to petitioners; (5) whether the amounts deducted by W-T-W, Inc. (W-T-W), as compensation paid to Wright for the years ended August 31, 1986, and August 31, 1987, exceeded a reasonable allowance for compensation; (6) whether W-T-W may deduct estimated warranty expenses in the amount of $ 100,419 for the taxable year ended August 31, 1987; (7) whether respondent has proven that Wright is liable for additions to tax for fraud under section 6653(b) with respect to underpayments in all of the taxable years at issue in connection with certain of the transactions at issue, or whether additions to tax for negligence are applicable; (8) whether respondent has proven that W-T-W is liable for additions to tax for fraud under section 6653(b) in connection with the underpayments of tax for the taxable years ended August 31, 1986, and August 31, 1987, or whether additions to tax for negligence are applicable; (9) whether Wright and Lynne L. Wright (the Wrights) are liable for an addition to tax for negligence for 1986 on certain amounts not determined to be fraudulent; (10) whether W-T-W is liable for an addition *335 to tax for negligence for the taxable year ended August 31, 1987, on certain amounts not determined to be fraudulent; (11) whether the Wrights are liable for additions to tax under section 6661 for 1983 through 1987; (12) whether W-T-W is liable for additions to tax under section 6661 for the taxable years ended August 31, 1986, and August 31, 1987; and (13) whether the Wrights had substantial underpayments of tax attributable to tax-motivated transactions under section 6621(c) for 1983 through 1987.
FINDINGS OF FACT Some of the facts have been stipulated, and the stipulated facts are incorporated in our findings by this reference. The Wrights resided in Bakersfield, California, when they filed their petition. W-T-W was a Washington corporation with its principal office located in Bakersfield, California, when it filed its petition. Wright completed the 10th grade and dropped out of high school before completing his junior year. Wright began selling cars in 1949, holding various positions, and became an automobile dealer in 1961. Wright was not a dealer from 1964 through 1969, but he became a dealer again in 1970. Dealer Operations Generally
During all relevant periods, Wright owned *336 directly or indirectly all or a majority of the following dealerships (the Wright dealerships): (1) Bill Wright Toyota, Inc., a California corporation (Bill Wright Toyota), since 1977; (2) W-T-W, a Washington corporation (formerly Tom Chapman Ford, Inc.), doing business as Totem Lake Ford/Toyota (referred to as either W-T-W or Totem Lake Ford/Toyota), since 1982; (3) Sierra Toyota, Inc. (originally called Taylaurel Motors, Inc., until its name was changed to Sierra Toyota, Inc., in 1985), a California corporation (Sierra Toyota), since its incorporation in 1984; (4) West Seattle Nissan, Inc., a Washington corporation (West Seattle Nissan), since its incorporation in 1985; (5) R & W Chevrolet, Inc., a Washington corporation (R & W Chevrolet), since its incorporation in 1985; and (6) Totem Lake Suzuki, Inc., a Washington corporation (Totem Lake Suzuki), since its incorporation in 1986. As used herein, the term "the Wright dealerships" does not necessarily include all of the above dealerships. In 1985, both Bill Wright Toyota and Totem Lake Ford/Toyota were among the top Toyota dealerships in the United States based upon sales volume. In that same year, the Ford dealership that was *337 part of Totem Lake Ford/Toyota was also one of the most profitable Ford dealerships in the United States. Wright was very involved in all aspects of the operations of the Wright dealerships, including the financial aspects of the business. Policies were set and management decisions were ultimately made by Wright personally. From 1983 thorugh 1987, the Finance and Insurance (F & I) departments of the Wright dealerships sold credit life and credit accident and health insurance (credit insurance) in connection with loans extended for car purchases. Credit insurance was sold to fulfill a borrower's loan obligation in the event the borrower died or became disabled. In the case of the credit accident and health (sometimes referred to as credit disability) policies, the insurance would provide a monthly payment, during the term of coverage, while the insured was disabled. The term of the coverage was the same as the term of the loan. During the years at issue, Commercial Bankers Life Insurance Company (CBL) was the direct insurer of the credit insurance sold by the Wright dealerships. The credit insurance sold by the Wright dealerships was virtually all single premium insurance. When *338 a single premium is charged for credit insurance, as is true in these cases, the insurer collects the full premium at the time the policy is issued. During 1983 through 1987, the F & I department of each of the Wright dealerships also sold extended warranty service contracts (service contracts) to vehicle purchasers. The service contracts were between car purchasers and the Wright dealerships. The service contracts were administered by Kelley Blue Book (Kelley), Mechanical Insurance Associates, Inc. (MIA), and Northwest Underwriters, Inc. (Northwest) (collectively referred to as the administrators). Wright decided which company would administer the service contracts for the dealerships. The administrators provided the dealerships with "dealer cost schedules", which established administrative fees to be remitted to the administrators for various contract terms and classes of vehicles. The fees were changed from time to time by the administrators. The difference between the actual price paid by the customer and the amount remitted to the administrator was retained by the selling dealership. The actual sales price of service contracts was subject to negotiation between the dealership *339 and the customer, and the prices varied accordingly. A portion of the amount paid to the administrators was used to purchase insurance related to service contract claims. FIR
As directed by Wright, on April 20, 1983, Fred Winger (Winger), comptroller for the Wright dealerships and FIR, forwarded $ 2,500 to John Steven Mailho (Mailho) to form a reinsurance company called N.B.I., Ltd. (NBI), which later became FIR. On May 4, 1983, a meeting was held in the Red Carpet Room at the Los Angeles airport (the Red Carpet Room meeting). Mailho, Wright, James F. Wright (Wright's son), Eugene Murphy and William T. Matlock (Matlock) from CBL, and Robert Eads from Kelley attended the Red Carpet Room meeting. The purpose of the meeting was to discuss whether Wright was interested in participating in a reinsurance arrangement to be structured among CBL, Mailho, and a reinsurance company to be formed by Wright. At the meeting, transactions were contemplated that involved the sale by the Wright dealerships of CBL credit insurance policies and the subsequent reinsurance of such policies, directly or indirectly, with a Wright-owned insurance company. Mailho and the CBL representatives promoted the *340 contemplated reinsurance transactions. Wright had not researched Mailho's credentials prior to the meeting. Mailho did not have a college or any other advanced degree. He did not have any formal training in income taxation and did not represent himself as an expert in that field. From 1967 through 1978, Mailho held numerous positions at companies related to the insurance industry. His responsibilities never included decision making regarding reserve requirements. In 1978, Mailho became a consultant. Around 1979, Mailho began to form offshore reinsurance companies in the Turks and Caicos Islands. Prior to 1983, Mailho had formed many offshore reinsurance companies. The majority of companies formed by Mailho were owned by automobile dealers. By 1983, Mailho had established a reputation in the credit insurance industry as a person who was knowledgeable in forming and operating offshore reinsurance companies. From 1983 through 1987, Mailho was the principal and president of the Mailho Company. The Mailho Company was in the business of consulting with insurance companies on the marketing of their products, especially credit insurance in the area of automobile after-market sales. *341 From 1983 through 1987, Mailho was also a director of Lucien Compagnie d'Assurance, Ltd. (Lucien). On May 12, 1983, Mailho received approval from Wright to proceed with incorporation of an insurance company for Wright. On May 18, 1983, NBI was incorporated in the Turks and Caicos Islands. On November 8, 1983, NBI changed its name to FIR. During all relevant periods after May 18, 1983, Wright owned between 90 and 100 percent of FIR. (During part of the time, 10 percent was held by Wright's son.) Once FIR was formed, Wright communicated with Mailho regarding the day-to-day business of FIR. On or about June 17, 1983, Mailho, Wright, Mel Ashland (Ashland), and Frank J. Cicone (Cicone) met in Bakersfield, California, to discuss the proposed reinsurance transactions. Ashland was Wright's accountant and, at all relevant times, a certified public accountant (C.P.A.) licensed to practice in California. Ashland had been employed by Arthur Andersen & Co. (Andersen) until 1975, when he started a C.P.A. partnership, Richardson and Ashland, in Bakersfield, California. From 1976 to 1986, Ashland was Wright's principal source of accounting and tax guidance. Ashland provided tax and accounting *342 services for the Wright-owned entities. Ashland discussed with Wright any documents that Ashland received in connection with Wright's affairs. Ashland informed Wright that Ashland was not an expert in the areas of insurance or insurance taxation. Wright attended all meetings between Ashland and Mailho. During all of the years at issue, Cicone was Wright's general business attorney. Cicone informed Wright that Cicone was not a tax or insurance specialist. At the June 1983 meeting, Mailho gave a presentation on reinsurance, describing what types of companies were subject to State regulation. He characterized an offshore reinsurance company, such as FIR, as being outside of the "regulatory circle". The meeting also included discussions of the following with respect to reinsurance companies: (1) Possible income; (2) possible expenses; (3) the test under the tax law to qualify as a life insurance company; (4) the marginal tax bracket for small life insurance companies; (5) sites for organization; and (6) tax status. Mailho recommended that Wright's reinsurance company be incorporated in the Turks and Caicos Islands to avoid State regulation and capital requirements and that it become *343 authorized to do business in Nevada to avoid corporate income taxes. In a letter addressed to Cicone, with a copy sent to Wright, dated June 28, 1983, Mailho stated that "minimizing or deferring the tax event is the cornerstone of our operational plan." In the letter, Mailho also recommended consultants who might provide an opinion to Wright regarding the FIR transactions. In a letter to Wright dated July 7, 1983, Cicone recommended that, instead of contacting a consultant suggested by Mailho, "I would feel safer in going to a 'Big Eight' accounting firm where we can find a tax accountant who would * * * render an opinion as to the tax ability [sic] of the [FIR] transaction and also as to its legality." Ashland attempted to obtain an opinion covering the tax and legal issues raised by the FIR transaction. He discussed FIR with Andersen, a "Big Eight" firm, and Andersen did preliminary research on the matter. Prior to receiving any response from Andersen, Wright directed Totem Lake Ford/Toyota and Bill Wright Toyota to enter into agency agreements with CBL. Andersen indicated to Ashland that the cost of an opinion would be between $ 5,000 and $ 10,000 but that Andersen had some tax *344 concerns regarding the transactions and would need additional specific information. Ashland did nothing to acquire that information and never secured a written tax or legal opinion. Wright was aware in 1983 that Ashland had not obtained a written tax opinion from Andersen. In November 1983, Ashland discussed with Cicone a potential "section 482 problem" regarding the contemplated FIR transactions. Ashland also discussed the section 482 concerns with Wright. Nevertheless, toward the end of 1983, Wright and Ashland agreed to continue with the transactions. Cicone had no dealings regarding FIR during 1984 and 1985. In 1986, Cicone prepared the minutes of FIR meetings for previous years. FIR's books and records reflect a capital contribution of $ 1,000. They also reflect a "receivable from officer" in the amount of $ 1,000 in 1983 that appears to be an offsetting journal entry for the $ 1,000 paid in capital. The books and records reflect that, at the end of 1983, Bill Wright Toyota loaned $ 20,000 to FIR. On December 27, 1983, FIR paid Bill Wright Toyota $ 55,000. On May 2, 1984, FIR repaid the $ 20,000 to Bill Wright Toyota. FIR became qualified to do business in Nevada on or *345 about January 18, 1984. FIR's duly appointed resident in Nevada was Laughlin Associates, Inc. (Laughlin). Laughlin offered a package under which -- You are provided with a mailing address in Carson City * * * When your Carson City office welcomes a visitor (maybe an investigator or lawyer) * * * they enter a complete office facility. * * * As your office manager I am also available should anyone wish to see an executive from your corporation. I will confirm this is indeed your office and support team, that all of the corporate officers are out in the field (or what ever) * * * * * * We will provide your corporation with a Nevada telephone number * * * that answers on our equipment. Your number will have its own yellow page listing - giving you legal proof of "holding out to do business" in Nevada. * * * These support services will demonstrate a day-to-day operation of your corporation in Nevada. This is the heart of any strategy to eliminate state corporate taxes, protect yourself from liability, or to make yourself judgment proof. * * *
FIR had no offices, furniture, or equipment. Credit Life Contracts Reinsurance agreements were entered into between CBL and Lucien (the CBL-Lucien *346 treaty) dated June 1983 and between Lucien and FIR (the Lucien-FIR treaty) dated November 1983. CBL was willing to enter into the transactions because Wright was a high-volume dealer and CBL wished to maintain the Wright dealerships as producers of its insurance. The material terms of the two treaties were similar. Article I of the CBL-Lucien treaty provided for cession of 100 percent of the insurance coverage on policies written by CBL and sold through the dealerships listed on an attached schedule. The schedule, dated December 24, 1983, listed Bill Wright Toyota and Totem Lake Ford/Toyota among other unaffiliated dealerships. The Lucien-FIR treaty provided for cession of 100 percent of Lucien's liability on all "credit life and credit disability" policies assumed by Lucien and sold through the dealerships identified on an attached schedule. This schedule, dated December 29, 1983, listed only Bill Wright Toyota and Totem Lake Ford/Toyota. Each treaty provided for payment to the reinsurer of 100 percent of gross premiums less returned premiums. Each treaty provided for rendition of ceding statements by the "ceding company" (the company giving up the risk: CBL in the CBL-Lucien *347 treaty and Lucien in the Lucien-FIR treaty) to the "reinsuring company" (the company assuming the risk: Lucien in the CBL-Lucien treaty and FIR in the Lucien-FIR treaty). Each treaty required the reinsuring company to maintain on deposit reserves in accordance with the terms of a "safekeeping agreement" purportedly attached thereto. Each treaty provided that the ceding company would supervise and pay all claims under the covered insurance policies and that the liability of the reinsuring company would follow that of the ceding company. Each treaty provided that the insolvency of the ceding company would not affect the liability of the reinsuring company for any claims. Each treaty contained a provision for modification, allowing for alteration by mutual consent by a signed addendum thereto. Neither treaty was modified in writing to include coverage of other Wright dealerships. After 1983, as Wright acquired Totem Lake Suzuki, Sierra Toyota, R & W Chevrolet, and West Seattle Nissan, those dealerships acted as agents for CBL in the sale of credit insurance. The policies that were produced by the later-acquired dealerships were treated as though covered by the reinsurance treaties *348 despite the absence of any written modifications to the treaties. The customary reasons for reinsurance, i.e., diversification and/or surplus relief for the direct insurer, did not apply to the transactions entered into among FIR, Lucien, and CBL. CBL charged Lucien a ceding fee of 10 percent. Lucien charged FIR a total fee of 11 percent and retained a net 1-percent ceding fee. In addition to the 1 percent, Lucien received compensation from the "float". A float occurred because CBL ceded the premiums to Lucien on a monthly basis, and Lucien only ceded the premiums to FIR on a quarterly basis. This resulted in a period during which Lucien owned the earnings on the insurance premiums. State law required CBL to hold assets in reserve for payments of future claims. Under the treaties, CBL required Lucien to maintain reserves on deposit, and Lucien required FIR to maintain reserves on deposit. For tax purposes, FIR deducted from its income the reserves required by Lucien. Ashland and Wright discussed the reserves of FIR, and together they resolved to find insurance policies and to establish reserves in an amount necessary to cover the projected income of FIR. A reserve is an estimate *349 at a specific point in time of the amount of money an insurer must hold back for future claim payments. Reserves are liabilities that must be supported by assets. For single premium insurance, because there are no future premiums to be paid, reserves must be set aside from the original premium to pay all future claims. On a given accounting date in the life of a credit insurance policy, there are two types of reserves: (1) Active life reserves are for future payments on future claims, i.e., after the accounting date. Active life reserves for credit disability policies are "unearned premium reserves". (2) Claim reserves are for pending claims to be paid after the accounting date. Reserves on life insurance policies are commonly determined through use of actuarial tables. For the years at issue, the minimum for statutory reserves for credit life in California was 100 percent of the 1958 Commissioners Standard Ordinary Mortality Table (the 1958CSO) and 4 percent interest. Washington required minimum reserves for credit life to be calculated using 130 percent of the 1958CSO and 3.5 percent interest. CBL calculated reserves using 100 percent of the 1958CSO and 3.5 percent interest. *350 Despite his lack of experience computing reserves, Mailho determined the reserves required of FIR. To calculate the reserves, Mailho relied on a previously prepared undated letter from Jerry Johnson (the Johnson letter), a consulting actuary. Mailho never consulted with Jerry Johnson about the specific circumstances of the CBL-Lucien-FIR transactions nor contacted him to determine whether such letter needed to be updated. The letter suggested calculating reserves by multiplying reserves required under the 1958CSO by 1.6. Mailho multiplied reserves required by CBL by 1.6. Because CBL already increased reserves for Washington-based policies by a factor of 130 percent (1.3), Mailho, in effect, calculated FIR's statutory reserves for Washington by multiplying the 1958CSO by a factor of 2.08 (1.3 x 1.6). This was higher than was required by CBL, Washington law, or the Johnson letter. FIR's credit life reserves exceeded minimum standards in California and Washington by a substantial margin due to the added conservatism suggested by the Johnson letter and to Mailho's error in calculating the reserves for policies issued in Washington. For the credit accident and health policies, the *351 minimum reserve standard required by California, during the years at issue, was calculated by the "Single Premium Method". The minimum reserve standard in Washington, during the years at issue, was calculated using the "Rule of 78" method. CBL computed earned premiums and the reserve for unearned premiums using the Rule of 78 method. Mailho computed earned and unearned premium reserves for FIR using the "pro rata" method. The pro rata method produced a higher reserve, or slower earning of income, than the methods used by California, Washington, or CBL. According to its books, FIR had a "negative surplus" in 1984, 1985, and 1986. This indicated that FIR owed more money than it was worth. If the reserves were calculated correctly, FIR did not have sufficient resources to pay anticipated claims. If the reserves were overstated, FIR understated earnings. For 1983, 1985, 1986, and 1987, CBL disclosed the reinsurance arrangement with Lucien on the annual statements that it filed with insurance departments and took credit for the amounts it claimed to be reinsured with Lucien. In order for CBL to take credit for amounts ceded to Lucien, an unauthorized unlicensed insurance company, *352 State law required CBL to hold custodial accounts for reserves required to be held by Lucien. The FIR reserves were purportedly held in custodial accounts as well. The treaties did not explicitly require the FIR/Lucien reserves to be held in a separate account from the Lucien/CBL reserves. During most of the years at issue, the same reserve assets were used as the required deposit under both treaties. A safekeeping agreement was executed on August 17, 1983, among Lucien, CBL, and First Interstate Bank of California (not affiliated with FIR) as the designated custodian (the custodian). Under this agreement, reserve deposits held in the custodial account were called the property of Lucien (referred to as "owner"), but investments, sales, purchases, and payment of income could only be made with notice to the custodian, signed by Lucien and an officer of CBL, among others. If Lucien became financially impaired, ownership of the assets passed to CBL. The custodial account was initially held in the form of a certificate of deposit (CD) under the safekeeping agreement. By letter dated October 26, 1984, Mailho wrote to Matlock at CBL that FIR would -- place on deposit a letter of credit *353 * * * in the amount of one half million ($ 500,000) dollars * * * [to] be used in lieu of a like amount to be maintained in Custody between Lucien and Commercial Bankers. Upon receipt of this "Evergreen irrevocable Letter of Credit" from Mel Ashland (accountant for First Interstate Re), you may immediately release four hundred thousand seven hundred eighty-one & 89/100 ($ 400,781.89) dollars from the custodial account to First Interstate Re Ltd. * * *
In October 1984, FIR procured and delivered to CBL an irrevocable letter of credit, issued by Security Pacific National Bank in the face amount of $ 500,000. Bill Wright Toyota was the applicant for the letter of credit. On November 13, 1984, a letter from CBL to First Interstate Bank of California authorized First Interstate Bank of California to distribute the balance of the custodial account as follows: (1) $ 400,781.89, payable to FIR, through Ashland; (2) $ 21,558 to CBL; and (3) $ 88,672.72 to Lucien. From 1985 through July 1987, Lucien purchased CD's, which it physically delivered to CBL, in an amount necessary to satisfy the increasing reserve requirements in excess of the letter of credit. CBL was not always named as co-owner *354 of the CD's. Prior to July 1987, Mailho also provided to CBL passbooks to accounts from which Mailho could unilaterally withdraw funds. CBL was concerned about its rights and, on several occasions, wrote letters of criticism to Mailho regarding the adequacy of the reserve assets. In July 1987, Lucien delivered to CBL a $ 425,000 check. Mailho requested that CBL consider use of the "Kemper Family of funds" as the asset securing the reserves and represented that CBL would possess sole and unrestricted access to the funds. A Kemper funds account was subsequently opened. For 1983 through 1987, the maximum commission allowed to be paid to an agent for the sale of credit life and credit accident and health insurance in Washington was 40 percent of the gross premium. During the years at issue, California imposed maximum commissions ranging from 20 to 35 percent. The Wright dealerships were subject to these limitations. From 1983 through 1987, Wright arranged for the Wright dealerships to earn commissions, from the sale of CBL credit insurance, that were less than the maximum allowed by their respective States. CBL did not require the dealerships to accept lower commissions. By reducing *355 the commissions that CBL paid to the dealerships, Wright increased the net premium paid to CBL, the portion of the premium subsequently ceded to Lucien, and, ultimately, the portion ceded to FIR. Thus, the income to the Wright dealerships was decreased and the income to FIR was increased. Service Contracts
From 1983 through 1987, petitioners diverted money to FIR through the service contract administrators. From 1983 through 1986, the Wright dealerships paid to Kelley amounts in excess of the "dealer cost" of the contracts. From 1984 through 1986, Totem Lake Ford/Toyota and West Seattle Nissan paid to MIA amounts in excess of the dealer cost of the contracts. From 1986 through 1988, the Wright dealerships submitted to Northwest amounts in excess of the dealer cost of the contracts. Wright had exclusive control over where these excess payments (the oversubmits) were sent. Checks equal to the amount of the oversubmits, generally made payable to FIR (or NBI), were forwarded by the service contract administrators to either Ashland or Winger and then deposited into the FIR bank account. During 1986 and 1987, checks totaling over $ 400,000 were written from Northwest to W-T-W, endorsed *356 by W-T-W, and deposited into the FIR bank account. Wright had exclusive control over that account. No services were provided by FIR in exchange for the oversubmits. From 1983 through 1987, FIR did not enter into a written insurance or reinsurance contract relating to service contracts with Kelley, MIA, or Northwest; FIR bore no legal risk relating to service contracts administered by Kelley, MIA, or Northwest; and FIR did not execute any document with Kelley, MIA, or Northwest setting forth the terms of any agreement between them. Personal commissions of Wright dealership employees who sold service contract policies were determined by subtracting the "cost" of the policy (including the dealer cost) from the actual sales price of the policy. The overpayments that were paid by the Wright dealerships to administrators of the service contracts and then to FIR decreased the commissions to the dealerships and their employees by increasing the "cost" of the policy. Donald Lee Wilson (Wilson), a 15-percent shareholder in Sierra Toyota from November 1984 to July 1985, discovered that his income was being reduced by the oversubmits. When Wright was asked by Wilson where the oversubmits were *357 going, he replied that the money was going to an offshore company for his retirement and that Wright's son and Wilson would participate in the oversubmits in accordance with their respective percentages of ownership. Wilson never received his portion. Winger prepared monthly, quarterly, and annual reports for FIR that listed its income, including the oversubmits and disbursements. Wright told Winger that the overpayments from the service contracts were being placed in FIR to save on taxes. Ashland, Price Waterhouse & Co. (Price Waterhouse), and Deborah Bender (Bender) were aware that oversubmits were paid to the service contract administrators. Ashland recognized that such payments raised questions under section 482. Other FIR Transactions
FIR purported to act as reinsurer for New England States Re, Ltd. (New England), and Independent State Ltd. (Independent). The New England and Independent "transactions" accounted for a large portion of the reserves deducted by FIR on its 1984 through 1986 returns. FIR did not report any interest income from the reserves that related to the New England or Independent transactions. New England and Independent purported to recapture their respective *358 ceded policies as of December 31, 1987. The recapture transactions were represented in journal entries. FIR purported to write directly warranty insurance policies through an agreement with Yanton, Inc. (Yanton). Yanton was located in New Hampshire. FIR did not report any interest income from the reserves that related to the Yanton reserve account. Eleanor J. Chumley (Chumley), Mailho's independent agent and bookkeeper for FIR, recorded the Yanton transactions in FIR's books and records. Figures with respect to the Yanton transactions were communicated to Chumley through telephone conversations. Underlying documents were not provided to Chumley to support these figures. From 1983 through 1987, Mailho negotiated many of the transactions involving FIR, including those with New England, Independent, and Yanton. Wright, however, made the ultimate decisions for FIR to enter into transactions with New England, Independent, and Yanton. From 1983 through 1987, Wright received many distributions from FIR. With Mailho's approval, Wright used the funds that were released to FIR as the result of the $ 500,000 letter of credit to capitalize Sierra Toyota to enable it to purchase the assets *359 of World Wide Motors, Ltd., on November 20, 1984. Wright also used additional funds held in bank accounts by FIR. Some of the distributions were characterized as loans. The amounts reflected in notes and in the FIR books and records as owed by Wright to FIR ranged from $ 55,000 to $ 959,252. Loan documents were executed for these transactions in 1986 when Cicone "cleaned up" FIR's records. Many of the promissory and demand notes were unsigned. On or before December 31, 1986, Wright's advisers recommended that he declare a dividend from FIR to himself, in order to repay the company, and he did so. Wright declared $ 945,550 as a return of FIR capital on his 1986 return. In an August 5, 1986, letter, Cicone informed Wright that, shortly prior to that date, Ashland had told him that the "Big Eight" firm did not render a tax opinion because of uncertainties. Cicone further stated that he was "not sure whether * * * [the FIR transactions had] worked for tax purposes" and that FIR was "in a risky position". In an August 14, 1986, letter to Wright, Cicone stated that, "As you will remember, when this Corporation was formed, you took a substantial tax risk because we could never obtain *360 an opinion letter from the accountants regarding the tax treatment of the Corporation." Nevertheless, on or about July 1, 1988, in a conversation with a criminal investigator for the Internal Revenue Service (IRS), Wright represented that he had obtained a "Big Five" (Wright's term) opinion with respect to the FIR transactions. From 1983 through 1987, Price Waterhouse prepared many tax returns for Wright and the Wright dealerships. These included the 1985 and 1986 tax returns for the Wrights. Ashland prepared and signed the 1983 and 1984 tax returns for the Wrights. In 1986, Bender, a California C.P.A. and then employee of Price Waterhouse, became one of the accountants for Wright. Bender prepared the Wrights' 1987 tax return. A January 1989 letter from Bender to Mailho indicated that Mailho was cooperating in providing Bender with the necessary information in order to prepare FIR's tax returns. To assist in the preparation of the 1987 FIR annual statement and income tax return, Wright retained the actuarial firm of Milliman & Robertson, Inc. (Milliman). In a report containing an analysis of FIR reserves, sent to Bender on October 2, 1989, Milliman advised Bender that a substantial *361 decrease in the statutory reserves of FIR had occurred in 1987. As of July 15, 1992, FIR had not filed income tax returns for 1987 through 1991. Ownership of Annuities
During 1986 and 1987, the Wright dealerships participated in the Northwest "Fully Insured Program" in connection with service contracts sold by the Wright dealerships and administered by Northwest. Northwest represented to dealerships that, under such program, the dealer would have no continuing liability on service contract claims once the contract was written. From the payment received for each service contract sold, the Wright dealerships had to remit the dealer cost to Northwest. Northwest retained a portion of this amount as an administrative fee. A portion of the payment to Northwest was used to purchase "stop loss" insurance policies for the service contracts from Consumers Indemnity Insurance Company (Consumers), a licensed insurance company. Norman Cimoch (Cimoch) owned both Northwest and Consumers. When Wright began to do business with Northwest, he was unaware of the common ownership of Northwest and Consumers. The insurance policies purchased from Consumers stated that Consumers would reimburse losses *362 after an aggregate deductible was satisfied. The table to be used to determine the aggregate deductible was incomplete. Another portion of the payment to Northwest was invested in separate flexible premium annuity contracts (the annuities) issued by Western United Life Assurance Company (Western United) of Spokane Washington. The amount deposited into the annuities was intended to be equal to the anticipated claims for the covered vehicles based upon actuarial studies conducted by Northwest. The individual dealerships were listed as the annuitants. Consumers was listed as the beneficiary. Under the terms of the annuities and related agreements, the funds in an annuity account, other than interest earnings, functioned as a reserve out of which Consumers could pay claims made under the service contracts. The dealerships were entitled to the interest earned on the annuities. Neither Wright nor the Wright dealerships could withdraw funds from the annuities until all of the Northwest service contracts that were sold by a dealership under this program had expired. If any money was left in the annuities after the service contracts had expired, such amounts would be returned to the *363 dealership. On or about October 31, 1988, Consumers was placed into a receivership by the Washington State Insurance Commission. The receiver, Joseph W. Sterne (Sterne), observed that the procedure of the Wright dealerships for claim payment and for the collection and deposit of money was consistent with the events and transactions of the other dealerships that Sterne determined to be part of the "Fully Insured Program". On December 23, 1988, the receiver, Sterne, obtained an order from the Superior Court of the State of Washington that authorized the release to the dealerships of the funds held in the annuity accounts. The order stated that: those annuities now being held by Western United Life Assurance Company under the FIP [Fully Insured Program] Dealer Reserve are not the property of the Consumers Receivership, nor do they constitute a general asset of the Receivership * * * and finding that the true owner of the annuities are the individual car dealers identified in Exhibit B * * * [which included Bill Wright Toyota, R & W Chevrolet, Sierra Toyota, Totem Lake Suzuki, and Tom Chapman Ford/Totem Lake] and finding that * * * Receiver of Consumers, has verified the identity, ownership *364 and amount of annuity of each individual dealer * * * it is ORDERED, ADJUDGED AND DECREED that: * * * The Receiver is * * * authorized to expressly release any and all claim of ownership * * *
Wright's Compensation
Prior to April 1, 1983, Wright was an employee of Bill Wright Toyota. Bill Wright Toyota and Wright executed a Termination Agreement, dated April 1, 1983, that terminated their employment relationship. During the relevant period, Wright was Chief Executive Officer (CEO) of W-T-W. As CEO, Wright was actively involved in the management of W-T-W. He was also engaged in sales promotion and advertising for the dealership, including the recording and broadcasting of local television commercials. As a result of this advertising, Wright became well-known in the Seattle, Washington, area for the quote that ended many of the commercials: "And that I personally guarantee. By the way, I'm Bill Wright, owner". W-T-W entered into a consulting agreement with Bill Wright Toyota on May 1, 1983. Under this agreement, W-T-W provided the services of Wright to Bill Wright Toyota. The agreement was executed by Wright on behalf of both parties. During the years at issue, Wright lived in *365 Seattle, Washington, but he counseled his son, the general manager of Bill Wright Toyota, by telephone and traveled to Bakersfield, California, to review personally the operations at Bill Wright Toyota. Wright, individually, and W-T-W suffered from adverse publicity in 1985 due to a suit filed by the Office of Attorney General of the State of Washington. Wright's value to Totem Lake Ford/Toyota as a television spokesman was reduced as a result of the adverse publicity. In November 1985, W-T-W entered into a consent decree with the Washington Attorney General for alleged violations of the consumer protection laws of the State. During the year ended August 31, 1986, gross sales for W-T-W declined to approximately $ 48.5 million. W-T-W reported a gross profit of $ 6,580,321 for its 1986 year and $ 5,848,863 for its 1987 year. Wright was compensated by W-T-W as follows: Year Ended Year Ended Year Ended August 1985
August 1986
August 1987
Wages per return
$ 328,708  $ 618,960
$ 360,000
Consultant fees
0  61,550
116,019
Bonus
1,000,000
0  0  Total
$ 1,328,708
$ 680,510
$ 476,019 For the year ended October 31, 1986, Bill Wright Toyota reported $ 168,955 as compensation to Wright's son. The Toyota Portland *366 region "Business Management Region Trend Report" reported that Toyota dealers were earning 3.0 percent of total gross profit in 1986 and 3.1 percent of total gross profit in 1987. Bender reviewed Wright's compensation arrangements. John Walsh, also of Price Waterhouse, signed the 1986 and 1987 W-T-W returns. The amount paid to Wright as wages was clearly disclosed on the W-T-W returns. The amount paid to Wright as consultant fees was not clearly disclosed. Respondent disallowed $ 437,160 of the W-T-W deduction for compensation for its 1986 fiscal year and $ 255,687 of the deduction for its 1987 fiscal year. Respondent's determination of reasonable compensation was based on .5 percent of the sales of W-T-W. Estimated Warranty Expenses
W-T-W deducted $ 100,419 as an estimated warranty expense for its taxable year ended August 31, 1987. Respondent disallowed that deduction. OPINION With respect to the issues in this case other than fraud, unless otherwise indicated, the burden is on petitioners to prove that respondent erred in the allocations of income to petitioners. Rule 142(a). Allocation of FIR Income
Respondent presents four alternative arguments that income, allocated by *367 petitioners to FIR, should be allocated instead to petitioners. Respondent contends that FIR was a sham and was engaged in sham transactions; that income was improperly assigned to FIR; that income should be allocated to FIR under section 482; or that income should be allocated to FIR under section 845. Respondent asserts that FIR was not an insurance company but a sham formed for the purpose of avoiding tax on income earned by the Wright dealerships from the sale of credit insurance policies and vehicle service contracts. Respondent further claims that the transactions entered into by FIR were sham transactions and that, although they were cast in the form of reinsurance, the true substance of the transactions was the avoidance of tax on income earned by the Wright dealerships. Petitioners argues that Wright structured the transactions at issue in order to achieve, through reinsurance, the legitimate business purpose of sharing in the underwriting risks and profits from the sale of credit insurance and vehicle service contracts sold by the Wright dealerships. Although a taxpayer has the right to arrange his affairs to reduce his tax liability, the substance of a transaction must *368 govern its tax consequences regardless of the form in which the transaction is cast. Gregory v. Helvering, 293 U.S. 465, 469 (1935); Bail Bonds by Marvin Nelson, Inc. v. Commissioner, T.C. Memo. 1986-23, affd. 820 F.2d 1543 (9th Cir. 1987). A corporation remains a separate taxable entity as long as the purpose for its incorporation "is the equivalent of business activity or is followed by the carrying on of business by the corporation * * * the corporate form may be disregarded where it is a sham or unreal." Moline Properties, Inc. v. Commissioner, 319 U.S. 436, 439 (1943). Factors similar to those set out in Moline are used to determine whether a transaction is a sham: (1) Whether the taxpayer had a business purpose for engaging in the transaction other than tax avoidance or (2) whether the transaction had economic substance beyond the creation of tax benefits. Bail Bonds by Marvin Nelson, Inc. v. Commissioner, 820 F.2d 1543, 1549 (9th Cir. 1987), affg. T.C. Memo. 1986-23. "There is no real difference between the business purpose and the economic substance rules. Both simply state that the Commissioner may look beyond the form of an action to discover its substance." Zmuda v. Commissioner, 731 F.2d 1417, 1420 (9th Cir. 1984), *369 affg. 79 T.C. 714 (1982); see also Sochin v. Commissioner, 843 F.2d 351, 354 (9th Cir. 1988), affg. Brown v. Commissioner, 85 T.C. 968 (1985). In Bail Bonds, Marvin Nelson (Nelson), a California bail bondsman, contracted with several insurance companies to act as surety on bail bonds that he wrote. Nelson signed a reinsurance agreement with Farila, a Netherlands Antilles corporation. Nelson made only two premium payments to Farila, and there was no evidence that any payments were made by Farila to Nelson. The Court found that Farila was part of a system of corporations through which money was shifted to avoid the payment of taxes and held that the transactions at issue did not have economic substance. Bail Bonds by Marvin Nelson, Inc. v. Commissioner, T.C. Memo. 1986-23, affd. 820 F.2d 1543 (9th Cir. 1987). Petitioners claim that the Bail Bonds case is distinguishable from the present cases. However, notwithstanding any factual differences, the Court's analysis in finding the reinsurance agreement without economic substance is applicable to the cases at hand. The Court there stated that: On its face the Reinsurance Agreement purported to achieve petitioner's objective * * *370 * However, when we consider the circumstances surrounding the Agreement and the treatment of the transaction by the parties, it becomes apparent that the Agreement was mere camouflage designed to disguise a scheme of creating deductions by shifting money back and forth from one party to another through various intermediaries * * * [Bail Bonds by Marvin Nelson, Inc. v. Commissioner, T.C. Memo. 1986-23.]
This statement is equally descriptive of petitioners' FIR transactions. Each treaty, on its face, appears to be a legitimate reinsurance agreement. However, as described below, the circumstances surrounding the formation, bookkeeping, and transactions of FIR disclose the overriding purpose of tax avoidance. For example, Wright, as a high-volume car dealer, could have received from CBL the maximum commissions on the sale of credit insurance policies by the Wright dealerships. However, once the premiums were being ceded to FIR, Wright requested a reduction in the commissions paid to his dealerships. Because CBL and Lucien each received a fixed percentage of the ceded premium as commission, the reduction in commission paid to the dealerships caused a larger amount to be remitted to CBL *371 as a "premium" and a larger net premium to be ceded to FIR. Through the diversion of commissions to FIR, the Wright dealerships earned their full commissions, and more, while reducing their taxable income. Wright had complete control over the placement of such income at least up to the maximum commission amount. Wright would not have voluntarily reduced commissions paid to his dealerships if they were not going to be forwarded to a Wright-owned entity. Finally, petitioners ensured through inflated and sham reserves that FIR did not take into account a single dollar of such commissions. Further, oversubmits, which consisted of money earned by the Wright dealerships from the sale of service contracts and which should have been reported as commission income by the dealerships, were remitted to FIR. No services were performed by FIR to earn such money, and the purpose of the diversion to FIR was to avoid the payment of tax. After trial, petitioners conceded that the oversubmits should be allocated under section 482 to the Wright dealerships. Petitioners rely on Alinco Life Insurance, Co. v. United States, 178 Ct. Cl. 813, 373 F.2d 336 (1967), and argue that the FIR transactions were *372 economically motivated and that bypassing State-imposed commission limitations by entering into reinsurance transactions to increase profits is a valid business purpose. In Alinco, a finance company (Associates) originated substantial credit life insurance business for which its subsidiary (Morco) had previously received commissions. This commission agreement violated the State insurance law. Associates organized Alinco in Indiana as a reinsurance company to enter into a reinsurance treaty with the direct writer of the insurance (Old Republic). Old Republic agreed to reinsure with Alinco 18 percent of all of its credit life insurance (excluding certain categories of risks) and to pay Alinco 18 percent of the gross premiums received for such insurance. In return, Alinco agreed to reimburse Old Republic for 18 percent of its losses. Old Republic simultaneously ceased paying commissions to Morco. Alinco filed returns as a life insurance company and claimed the benefits of such status. The Commissioner attacked this treatment under section 269 by arguing that Alinco did not qualify as an "insurance company" or as a "life insurance company". The court rejected the Commissioner's *373 argument that Associates' principal purpose in forming Alinco was to convert ordinary commission income into tax-free underwriting income. Id. at 341. The court recognized, as a valid business purpose, the creation of Alinco to earn underwriting profits in order to avoid paying commissions that would violate State law. Id. at 342. Petitioners assert that the court's reasoning in the Alinco case is applicable here, because the only way that Wright could increase the ultimate profit of the Wright dealerships without violating State maximum commission laws was to establish a reinsurance company. The cases are distinguishable. Associates' purpose in arranging to share in the profits of Old Republic, through Alinco, was compliance with State law. In these cases, the Wright dealerships chose to receive less commission than allowed by law and to divert to FIR income that was lawfully earned through services at the dealerships. In Alinco, insurance policies providing for coverage on borrowers of Associates and its subsidiaries were excluded from the reinsurance treaty. Alinco assumed substantial underwriting risk from Old Republic on risks of unrelated parties in return for the possibility *374 of underwriting profit. Here, policies providing for coverage on borrowers of the Wright dealerships were the only policies reinsured by FIR. Wright chose to go forward with the FIR transactions, regardless of the tax risk he knew to exist. Cicone advised Wright to obtain an outside tax opinion regarding the tax consequences of the FIR transactions from an objective party. Petitioners claim that Wright did not obtain the opinion because the cost was prohibitive. Given the recommendation from Cicone and the magnitude and longevity of the FIR transactions, it is implausible that Ashland and Wright decided to forego obtaining an outside opinion based on expense alone. It is probable that Ashland and Wright believed that, if Andersen were fully informed, Andersen would be unwilling to issue a favorable opinion for the transactions. Throughout the years at issue, Wright failed to keep the funds of FIR separate from the other Wright entities. Bill Wright Toyota applied for a letter of credit to replace the funds in the custodial account of FIR, and oversubmits earned by the Wright dealerships were deposited into the FIR bank account. Wright freely used funds that were in the custodial *375 accounts and in the FIR bank account. Numerous demand notes, promissory notes, bank reports, and journal entries in FIR's books and records indicate that Wright took numerous distributions and loans from FIR. These ranged in amount from $ 55,000 to $ 959,252. Such practices established Wright's purpose to divert the money from his dealerships for his own use, while avoiding the payment of taxes. Wright stated to Wilson that the oversubmits diverted to FIR were for the funding of his retirement account, and he stated to Winger that the oversubmits were diverted for tax savings. These are not "business purposes" for the formation of a reinsurance company. The totality of the evidence shows that Wright did not have a business purpose in forming FIR. Petitioners have further failed to show that the FIR transactions had economic substance. In order for a contractual relationship to qualify as insurance, there must be some indication of risk shifting and risk distribution. Helvering v. Le Gierse, 312 U.S. 531, 539 (1941); Steere Tank Lines, Inc. v. United States, 577 F.2d 279, 280 (5th Cir. 1978). Petitioners argue that FIR was a legitimate reinsurer and that it assumed full risk for *376 the insurance policies ceded to it. Wright purported to divert the risk and the premiums from CBL to FIR. However, Wright maintained control over the funds ceded to FIR and used them freely. Bill Wright Toyota provided the $ 500,000 letter of credit for FIR's custodial funds and therefore was at risk for insurance claims up to $ 500,000. Thus, the final risk remained with Wright and a Wright dealership and not with FIR.
Because, in effect, Wright, through FIR, insured the risks of only Wright-owned entities, the FIR reinsurance arrangement resembled that of a captive insurance company. A captive insurer is a corporation organized for the purpose of insuring the liabilities of its shareholders or their affiliates. Clougherty Packing Co. v. Commissioner, 811 F.2d 1297, 1298 n.1 (9th Cir. 1987), affg. 84 T.C. 948 (1985); Harper Group & Subsidiaries v. Commissioner, 96 T.C. 45, 46 n.3 (1991), affd. 979 F.2d 1341 (9th Cir. 1992). Unrelated business is a significant factor in determining whether risk transfer and risk distribution have occurred in a captive insurance context. Ocean Drilling & Exploration Co. v. United States, 988 F.2d 1135 (Fed. Cir. 1993); Harper Group & Subsidiaries v. Commissioner, supra at 59; *377 Amerco & Subsidiaries v. Commissioner, 96 T.C. 18 (1991), affd. 979 F.2d 162 (9th Cir. 1992). FIR insured no unrelated business. There were no unrelated parties that stood to lose if FIR could not meet its obligations. Neither risk shifting nor risk distribution occurred with respect to the FIR transactions. Petitioners contend that courts have held valid insurance arrangements similar to the ones entered into by FIR and the Wright dealerships. Petitioners cite Commissioner v. First Security Bank of Utah N.A, 405 U.S. 394 (1972); United States v. Consumer Life Ins. Co., 430 U.S. 725 (1977); Alinco Life Ins. Co. v. United States, 373 F.2d 336 (Ct. Cl. 1967); Local Finance Corp. v. Commissioner48 T.C. 773 (1967), affd. 407 F.2d 629 (7th Cir. 1969). These cases are distinguishable. The instant cases involve one Wright entity that only reinsured policies originated by other Wright entities. It was organized abroad and was not regulated by any government. It was inadequately capitalized and did not serve the commonly accepted purposes for reinsurance. The sources of FIR's income included voluntarily reduced commissions and diverted oversubmits. Wright, who owned the reinsurance company *378 and the insurance agents, exercised control over the reinsurer's funds. None of the cases cited by petitioners contains this combination of factors From the formation of FIR, Wright, Mailho, and Ashland displayed a pervasive lack of formality in the documentation and implementation of the transactions. FIR was organized abroad, was not an authorized insurer in any State, and had no offices, furniture, or equipment in either the United States or in the Turks and Caicos Islands. FIR was capitalized with only $ 1,000. It appears that this money was not even paid in to FIR but was simply offset by a book entry of "loan to officer" in the amount of $ 1,000. Later, much of FIR's income came from diversion of money it did not earn. FIR's books showed a "negative surplus" in 1984, 1985, and 1986, indicating that FIR either owed more money than it was worth or that it was understating its earnings. An example of the careless way in which these transactions were carried out was Mailho's use of an undated actuarial letter (the Johnson letter), unrelated to FIR, to determine the reserves required of FIR. Mailho did not even correctly follow the directions in the Johnson letter. The inflated *379 reserve calculations led to inflated reserve deductions on FIR's tax returns. Such practices confirm that the substance of FIR's business transactions was the avoidance of tax. The CBL-Lucien and Lucien-FIR treaties were never modified in writing to include the later-acquired Wright dealerships. There was only one safekeeping agreement used for both treaties. Part of the time, instead of maintaining cash on deposit in custodial accounts as required by CBL, Mailho provided "passbooks" to accounts from which he could withdraw money unilaterally. CBL was not satisfied with that arrangement. Later, Bill Wright Toyota, allegedly uninvolved in the FIR transactions, applied for and provided a $ 500,000 letter of credit to CBL to be used in lieu of funds in a custodial account. Although the New England and Independent transactions accounted for a large portion of the reserves deducted by FIR on its 1984 through 1986 returns, petitioners failed to produce any underlying documentation, other than the FIR annual statements and underlying accounting records, to support the reserves claimed by FIR regarding the New England or Independent transactions. Although FIR purported to write warranty *380 insurance policies directly through Yanton, the record does not contain any underlying documentation supporting the reserves claimed by FIR regarding the Yanton transactions. Petitioners declared no interest income from the alleged reserves held for the New England, Independent, or Yanton transactions. Petitioners admit that these transactions resulted in significant losses in 1983 through 1986 and should not necessarily be respected for tax purposes. Petitioners argue that the reduced commissions do not indicate a sham entity, and, if there is any reallocation, it should be under section 482. They claim that respondent should look to FIR for a remedy regarding the New England, Independent, and Yanton transactions and that such transactions do not demonstrate that FIR was a sham. Petitioners further argue that, if the reserves were too conservative, respondent should look to FIR for a remedy, not use the reserves as evidence of a sham. Petitioners' arguments fail to address the totality of the circumstances. The practices surrounding FIR, taken together, indicate that, in addition to lacking a business purpose, neither the FIR transactions nor FIR itself had economic substance. *381 Thus, we agree with respondent that FIR was a sham formed for the purpose of avoiding tax on income earned by the Wright dealerships. If the corporate form of FIR is disregarded, it follows that the income of FIR may be deemed received by Wright. "The income that is subject to a man's unfettered command and that he is free to enjoy at his own option may be taxed to him as his income, whether he sees fit to enjoy it or not." Corliss v. Bowers, 281 U.S. 376, 378 (1930). Wright had complete control over FIR and its funds and over funds that were paid into it. Wright controlled the oversubmits and the reduction in the credit insurance commissions. Further, he received from FIR numerous distributions and loans from "custodial funds" freed up by the letter of credit. Petitioners maintain that amounts in excess of the maximum commissions allowed by Washington and California, which could not be legally paid to the dealerships, cannot be allocated to Wright or his dealerships and that underwriting income cannot be allocated to Wright or the Wright dealerships because they could not conduct insurance business in California or Washington. Petitioners cite Commissioner v. First Security Bank of Utah, N.A., 405 U.S. 394 (1972), *382 for this proposition in their argument that section 482 is not applicable. These cases are unlike Commissioner v. First Security Bank of Utah, N.A., supra, in which the Court did not allow allocation under section 482 to an entity that could not have legally earned the income. In the present cases, petitioners improperly diverted income, over which they retained all of the benefits and risks of ownership, in order to avoid taxation on such income. Petitioners have presented no authority that money diverted to a sham entity, whether or not earned legally, is not taxable to its true owners. See James v. United States, 366 U.S. 213 (1961) (embezzlement income is taxable to an embezzler). A section 482 analysis is not appropriate under the circumstances. Accordingly, respondent's determinations, allocating the underwriting profit and the oversubmits, including interest on the oversubmits, to Wright and/or his dealerships, are sustained. Because these amounts are allocable to Wright under the above analysis, we do not address respondent's alternate theories or respondent's constructive dividend theory. Petitioners claim that loans made to Wright from FIR were taken into income by *383 Wright as a return on capital in 1986. Wright declared a $ 945,550 return on capital on his 1986 return. To the extent that this money is allocated to Wright under respondent's determinations, a corresponding adjustment should be made with respect to the 1986 return. Annuities
During 1986 and 1987, the Wright dealerships sold service contracts that were administered by Northwest under the "Fully Insured Program". The Wright dealerships kept a portion of the payments for the service contracts as commissions and forwarded the remainder to Northwest. Northwest used part of such payments to purchase stop-loss insurance from Consumers, deposited part of the payments into annuities issued by Western United, and kept the balance as administrative fees. Western United held separate annuities for each dealership in the "Fully Insured Program". The funds in the annuities were used to pay claims under the service contracts. The interest on the annuities belonged to the dealerships. However, neither Wright nor the Wright dealerships could use the principal of the annuities until all vehicle service contracts at a given dealership had expired or were otherwise terminated, at which point the *384 amount remaining in the annuity could be refunded to that dealership. On December 23, 1988, a court order was issued stating that the annuities held by Western United under the "Fully Insured Program" were not the property of Consumers, that the true owners were the individual car dealers, and that the annuities were to be released to the individual car dealers that owned them. Petitioners claim that the court order was obtained without notice to Wright or the Wright dealerships and that notice given to the Washington State Auto Dealer's Association (the Association) was not sufficient because neither Wright nor his dealerships were members of the Association at that time. We do not have enough evidence to determine the adequacy of the notice to petitioners. However, the order affected annuities held in connection with Northwest's "Fully Insured Program", and petitioners have not shown that the annuities for the Wright dealerships were any different than the other annuities held in connection with the "Fully Insured Program". Except in a tax context, it would be anomalous for petitioners to reject the conclusion that they were the owners of property otherwise subject to a receivership *385 and were entitled to refunds. Respondent contends that the annuities were owned by the Wright dealerships and that the funds placed into the annuities were income earned by the Wright dealerships from the sale of vehicle service contracts and thus includable on the dealerships' returns. Respondent further claims that such amounts were set aside as self-insurance for future claims on the dealerships and, therefore, should not be deductible as insurance premiums. Self-insurance plans whereby reserves are created or payments made into funds, accounts or trusts do not constitute "insurance" for these purposes. There is no shifting of the risk to others but instead reserves for possible losses are created. Payments so made are not deductible as insurance premiums. Spring Canyon Coal Co. v. Commissioner, 43 F.2d 78 (10th Cir. 1930). [Stearns-Roger Corp. v. United States, 774 F.2d 414, 415 (10th Cir. 1985).]
Further, even if the funds were administered by an independent agent, no deduction would be allowed for self-insurance, for contingent liabilities, or for reserves established to meet such contingent liabilities. Anesthesia Service Medical Group, Inc. v. Commissioner, 825 F.2d 241, 242 (9th Cir. 1987), *386 affg. 85 T.C. 1031 (1985). Petitioners assert that the amounts in the annuities were owned by Consumers for the purpose of paying off claims and that the chances of a dealership's obtaining a refund were slight. Petitioners also argue that respondent allows deductions for insurance premiums paid but subject to the possibility of a retrospective rate credit and that the possibility of a refund from the Western United annuities should be treated similarly. Respondent contends that the only insurance policies purchased by the Wright dealerships were the stop-loss policies with Consumers that did not provide for retrospective rate credits or refunds but were subject to an aggregate deductible. Cimoch testified that these policies "kicked in" if the annuities were insufficient. Respondent contends that the annuities should not be considered insurance. We agree. The amounts in the annuities did not constitute insurance because no risk shifting or risk distribution occurred. No risk was shifted away from the Wright dealerships because money was paid into an annuity by a Wright dealership, used to satisfy the obligations of that dealership under service contracts with its car buyers, *387 and then returned to the dealerships if not used for claims. No risk was distributed or pooled between dealerships, because the annuities were kept separate for each dealership and the claims of each dealership were paid only from its own annuity funds. Petitioners contend that the funds in the annuities should not be taxable to them because Northwest placed the premium payments into the annuities and the Wright dealerships had no access to the funds in the annuities until all possible claims were satisfied. Petitioners rely on United States v. Weber Paper Co., 320 F.2d 199 (8th Cir. 1963), in arguing that the real issue here is whether petitioners ever lost control over the premium payments. Weber Paper, however, is distinguishable because the subscribers in that case had the potential for a refund only if no losses had been paid out of a common fund shared with other subscribers. Id. at 203-204. In other words, risk distribution occurred in the Weber Paper case. The facts of these cases are more closely analogous to those of Commissioner v. Lincoln Savings and Loan Association, 403 U.S. 345 (1971). In Lincoln, "additional premium" payments were made by Lincoln Savings and Loan *388 Association (Lincoln) and other institutions to the Federal Savings and Loan Insurance Corporation (FSLIC) in order to fund a "Secondary Reserve". The payment of the additional premiums was required by statute. The Secondary Reserve was available for losses of FSLIC, only to the extent that other accounts of FSLIC were insufficient to cover such losses. Lincoln and each other institution insured by FSLIC had a pro rata share in the Secondary Reserve. An insured institution could obtain a cash refund of its pro rata share if its status as insured was terminated. Under certain conditions, the pro rata share of the institution could be used to pay premiums due by the institutions for the Primary Reserve; otherwise, the Secondary Reserve was "primarily available only for stated * * * purposes, namely, the payment of losses". Id. at 355. Separate accounts were maintained for the pro rata share of each insured institution. There was no indication that the funds were available to the insured institutions, but Lincoln and the other institutions were credited with the interest on their pro rata shares. The Supreme Court stated: "What is important and controlling * * * is that the * * *389 * [additional premium] payment serves to create or enhance for Lincoln what is essentially a separate and distinct additional asset". Id. at 354. In holding that the additional premium payments were not deductible, the Court noted in particular: (1) The Secondary Reserve was the asset last called upon by the FSLIC and (2) the insured institutions had distinct and recognized property interests in the Secondary Reserve, revealed by (a) the transferability, albeit limited, of the pro rata shares, (b) the possibility of prospective refunds, (c) FSLIC's maintenance of separate accounts for each pro rata share, and (d) the interest earned by the institutions on their pro rata shares. Id. at 355. The Court further noted that it did not regard as "contrarily persuasive" the following features: (1) The possibility that Lincoln's share of the Secondary Reserve would be consumed by FSLIC's losses and never refunded to Lincoln and (2) the general unlikelihood that Lincoln would recover its pro rata share of the reserve. Id. at 356-357. The annuities held in Western United possessed many of the same critical qualities as the funds in the Secondary Reserve account: (1) The possibility of prospective *390 refunds, (2) the maintenance of separate annuities for each dealership, and (3) the ownership by the dealership of the interest on the annuities. Further, petitioners' argument that the likelihood of a refund was slight is not persuasive under Lincoln. In addition, petitioners' argument that the dealerships did not own the annuities because the principal amount was unavailable does not distinguish the instant cases because there is no indication that the insured institutions had access to the Secondary Reserve. The evidence shows that the annuities were owned by the Wright dealerships and that they were, in substance, self-insurance reserves. Petitioners have failed to prove that the amounts in the Western United annuities were either excludable or deductible from the income of the Wright dealerships. Therefore, respondent's determinations with respect to the amounts held in the annuities are sustained. Reasonable Compensation
W-T-W claimed deductions in the amounts of $ 680,510 and $ 476,019 for its 1986 and 1987 fiscal years, respectively, for payments it made to Wright as salary and "consultant fees". Respondent contends that $ 437,160 for 1986 and $ 255,687 for 1987 were actually *391 constructive dividends paid to Wright in his capacity as the sole shareholder of W-T-W. Respondent determined reasonable compensation based on the sales of W-T-W. Section 162(a) allows deductions for all "ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including * * * a reasonable allowance for salaries or other compensation for personal services actually rendered". If the corporation is closely held and the persons receiving the compensation are shareholders, the payments are subject to close scrutiny to determine whether the alleged compensation is in fact a distribution of profits. Elliotts, Inc. v. Commissioner, 716 F.2d 1241, 1243 (9th Cir. 1983), revg. and remanding on other grounds T.C. Memo. 1980-282. Whether an expense that is claimed pursuant to section 162(a) is compensation for services rather than a distribution of profits is a question of fact that must be decided on the basis of the particular facts and circumstances. Paula Construction Co. v. Commissioner, 58 T.C. 1055, 1058-1059 (1972), affd. without published opinion 474 F.2d 1345 (5th Cir. 1973). Under section 1.162-7(a), Income Tax Regs., the "test *392 of deductibility in the case of compensation payments is whether they are reasonable and are in fact payments purely for services." The regulations further provide that: An ostensible salary paid by a corporation may be a distribution of a dividend on stock. This is likely to occur in the case of a corporation having few shareholders, practically all of whom draw salaries. If in such a case the salaries are in excess of those ordinarily paid for similar services and the excessive payments correspond or bear a close relationship to the stockholdings of the officers or employees, it would seem likely that the salaries are not paid wholly for services rendered, but that the excessive payments are a distribution of earnings upon the stock. * * * [Sec. 1.162-7(b)(1), Income Tax Regs.]
Petitioners argue that the full amount of the payments was reasonable because Bill Wright Toyota paid substantial sums to W-T-W under the consulting agreement, which agreement provided the services of Wright to Bill Wright Toyota. Petitioners state that Wright should have received at least 80 percent of such payments. The consulting agreement was signed by Wright on behalf of both Bill Wright Toyota and *393 W-T-W. There is no indication that it was an arm's-length transaction. Further, petitioners presented neither reliable evidence nor authority to support their contention that 80 percent of the payments is a reasonable percentage to determine Wright's salary. Petitioners claim that Wright's compensation was reasonable compared to other Toyota dealers. According to the Toyota Portland region "Business Management Region Trend Report", Toyota dealership owners were earning 3.0 percent of total gross profit in 1986 and 3.1 percent of total gross profit in 1987. According to petitioners, Wright should have received at least this much compensation based on the sales of both W-T-W and Bill Wright Toyota. Petitioners claim that Wright's salary should be based on the combined gross sales of W-T-W and Bill Wright Toyota, because Wright was effectively operating both. Wright and his son testified that Wright was in daily telephone contact with Bill Wright Toyota, and Wright testified that Wright made frequent visits to Bakersfield, California, to review the operations of Bill Wright Toyota. Bill Wright Toyota employed Wright's son as its full-time general manager. His salary in 1986 was $ *394 168,955. Petitioners have failed to prove that the sales of Bill Wright Toyota should be given as much weight as those of W-T-W or given any weight at all in determining Wright's salary. If based on W-T-W sales data and the figures from the trend reports, Wright's salary would have been $ 197,410 ($ 6,580,321 (gross profit of W-T-W) X 3.0%) for 1986 and $ 181,315 ($ 5,848,863 (gross profit of W-T-W) X 3.1%) for 1987. Respondent allowed W-T-W greater deductions in both years. Petitioners have failed to demonstrate that Wright deserved a salary greater than other Toyota dealers, especially in light of the Washington Attorney General's complaint and the ensuing negative publicity that affected, at the least, Wright's advertising value to W-T-W. Petitioners claim that we should consider past salary policy in determining the reasonableness of Wright's compensation. They cite Allison Corp. v. Commissioner, T.C. Memo. 1977-166, which upheld deductions for a "rational corporate salary policy consistently applied". They assert that we should rely on Wright's testimony that there was a salary formula, based on profits, in place for a number of years. Petitioners further claim that Wright's *395 salary was decreased by 65 percent from 1985 to 1987 while the gross profits fell only 24 percent in the same time frame. The formula referred to by petitioners is not in the record. There is no evidence other than Wright's testimony that it existed or that it was "rational" or "consistently applied". Further, without more substantial information about the factors affecting salary and gross profits of automobile dealerships, we have no way to correlate the percentage of decrease in salary to the decrease in gross profits. Finally, petitioners state that respondent's mechanical formula does not account for all of the relevant factors. They claim that, under RTS Investment Corp. v. Commissioner, T.C. Memo. 1987-98, affd. 877 F.2d 647 (8th Cir. 1989), affd. without opinion sub nom. Hilt v. Commissioner, 899 F.2d 1225 (9th Cir. 1990), the following factors should be considered in determining a reasonable salary: The employee's qualifications; the nature, extent, and scope of the employee's work; the size and complexity of the business; a comparison of salaries paid with income; the prevailing general economic conditions; a comparison of salaries with distributions to stockholders; *396 the salary policy of the taxpayer as to all employees; and the amount paid to the employee in previous years. Petitioners have not presented evidence with respect to all of the above factors. Nevertheless, we have considered the evidence presented with regard to the applicable factors. A portion of Wright's compensation was listed as a "consultant fee". Petitioners argue that this amount was separately deductible. According to Winger's testimony, this was a fee paid to W-T-W by each dealership, based on 2 percent of each dealership's inventory, to be used at Wright's discretion. Wright testified that this payment was to compensate him for personal liability he assumed by executing a continuing guarantee for all of the dealerships' financing. Petitioners have presented no evidence that 2 percent was a reasonable amount or that the amounts actually paid to Wright were equal to 2 percent of the dealerships' inventories. Thus, respondent's disallowance of the deduction taken by W-T-W for excess compensation is sustained. Estimated Warranty Expense
Petitioners conceded the disallowance of estimated warranty expenses for W-T-W's 1987 year. Petitioners belatedly ask us to determine *397 that they should receive an offsetting reduction in income for the following taxable year, a position not asserted prior to their post-trial brief. Petitioners claim that W-T-W restored the income for book purposes and that the subsequent income should be eliminated. Petitioners cite the W-T-W income tax returns for support of their position. We are unable to determine from the face of the returns whether the $ 100,419 amount was ever taken into income. Therefore, petitioners have not proven their entitlement to an adjustment of this income. Additions to Tax
Respondent asserts that petitioners (except Lynne L. Wright) are liable for additions to tax for fraud under section 6653(b) on certain portions of the underpayments in each of the years at issue due to the fraudulent acts of Wright and his dealerships (including W-T-W, R & W Chevrolet, West Seattle Nissan, and Totem Lake Suzuki). Our determination with respect to the fraud issue is dispositive of petitioners' allegation that the 1983 and 1984 notices of deficiency were not timely. The addition to tax for fraud is a civil sanction provided primarily as a safeguard for the protection of the revenue and to reimburse the Government *398 for the heavy expense of investigation and the loss resulting from a taxpayer's fraud. Helvering v. Mitchell, 303 U.S. 391, 401 (1938). Respondent has the burden of proving, by clear and convincing evidence, an underpayment and that some part of the underpayment for each year was due to fraud. Sec. 7454(a); Rule 142(b). This burden is met if it is shown that the taxpayer "intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of taxes". Petzoldt v. Commissioner, 92 T.C. 661, 699 (1989). The existence of fraud is a question to be resolved upon consideration of the entire record. Gajewski v. Commissioner, 67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978). Fraud will never be presumed. Beaver v. Commissioner, 55 T.C. 85, 92 (1970). Fraud may be proven by circumstantial evidence, because direct proof of the taxpayer's intent is rarely available. The taxpayer's entire course of conduct may establish the requisite fraudulent intent. Estate of Temple v. Commissioner, 67 T.C. 143, 161 (1976); Stone v. Commissioner, 56 T.C. 213, 223-224 (1971). During the years at issue, the provisions *399 of section 6653(b) changed. With respect to Wright's 1983, 1984, and 1985 tax returns and W-T-W's 1986 return, respondent must prove that some part of the underpayment is attributable to fraud, in order for the addition to tax for fraud to apply to the entire underpayment. With respect to the interest portion, respondent must show the amount of the underpayment attributable to fraud. Sec. 6653(b)(2). For returns due after December 31, 1986, including Wright's 1986 and 1987 returns and W-T-W's 1987 return, respondent must prove that some part of the underpayment is attributable to fraud with respect to both the addition to tax and the interest portions. Petitioners must then show the amount of the underpayment that is not attributable to fraud. Sec. 6653(b)(2). For 1983 through 1987, respondent determined that Wright is liable for additions to tax for fraud based on underpayments related to the oversubmits. For 1985, respondent also determined fraud based on the insurance premiums ceded to FIR and the interest income received on FIR's bank account in Nevada, which contained funds diverted from oversubmits. For 1986 and 1987, respondent additionally determined fraud based on flow-through *400 income from the S corporations, Totem Lake Suzuki, R & W Chevrolet, West Seattle Nissan, and W-T-W from oversubmits, deposits to the annuities, and interest on the annuities. With respect to W-T-W, respondent determined that W-T-W is liable for additions to tax for fraud for its 1986 year based on the oversubmits, the annuities including interest thereon, the insurance premiums ceded to FIR, and deductions for Wright's compensation. For W-T-W's 1987 year, respondent determined fraud based on the oversubmits. Courts have developed various factors, or "badges", that tend to establish fraud. These include: (1) A pattern of understatement of income; (2) inadequate books and records; (3) failure to file tax returns; (4) failure to cooperate with tax authorities; (5) implausible or inconsistent explanations of behavior; and (6) lack of credibility of the taxpayer's testimony. Laurins v. Commissioner, 889 F.2d 910, 913 (9th Cir. 1989), affg. Norman v. Commissioner, T.C. Memo. 1987-265; Bradford v. Commissioner, 796 F.2d 303, 307 (9th Cir. 1986), affg. T.C. Memo. 1984-601; Petzoldt v. Commissioner, supra.Willingness to defraud others in business may point to a willingness to defraud the *401 Government. Solomon v. Commissioner, 732 F.2d 1459, 1462 (6th Cir. 1984), affg. T.C. Memo. 1982-603. All of these factors are present in the instant cases. Further, corporations can engage in fraudulent activity through officers, employees, or agents. The wrongful acts and intentions of a corporation's representatives can be imputed to the corporation. Federbush v. Commissioner, 34 T.C. 740, 749 (1960), affd. 325 F.2d 1 (2d Cir. 1963). As conceded by petitioners on the oversubmits issue and as we have held above, Wright and the Wright dealerships have had a pattern of understatement of income throughout the years at issue. Further, the understatements were substantial and Wright had dominion and control over the unreported income, yet he failed to report it on his tax returns. The books and records of petitioners were inadequate. No documents were executed for various financial transfers among Wright, Bill Wright Toyota, and FIR until 1986 when Cicone "cleaned up" the records of FIR. Petitioners produced little documentation for the New England, Independent, and Yanton transactions, yet these transactions accounted for a large amount of reserves deducted by FIR on its 1984 through *402 1986 returns. In addition, when the New England and Independent business was purportedly recaptured, there were no recapture agreements but merely journal entries "zeroing out" the transaction. As of July 15, 1992, FIR had not filed its 1987 through 1991 income tax returns. Petitioners claim that this was due to Mailho's refusal to cooperate in the preparation of the 1987 annual statement, without which petitioners claim they could not file the 1987 return. A letter from Bender to Mailho, sent months after FIR usually filed its returns, indicated that Mailho was still cooperative at that point. Further, the Milliman report, which contained reserve estimates, was provided to Bender in October 1989. According to this report, the reserves for FIR would have been substantially decreased in 1987. Petitioners provided no plausible explanation as to why no returns were filed based upon the report or why no other appropriate individual was engaged to assist in the preparation of the returns. Wright made the misleading claim to a criminal investigator for the IRS that he had received a tax opinion for the FIR transactions. Wright's claim of ignorance as to the failure to obtain a tax *403 opinion and as to the general tax problems with respect to the FIR transactions is implausible. Wright's testimony lacked credibility and does not have to be accepted at face value. Wright's memory was selective. He claimed not to remember many critical facts about his dealerships. Wright testified that he told the participants at the Red Carpet Room meeting that he did not want to do anything illegal or immoral. At trial of these cases, two of the witnesses, who were present at that meeting, were questioned with respect to that unusual and self-serving statement and did not remember it. Wright's willingness to defraud an employee and part owner of Sierra Toyota may indicate a willingness to defraud the Government. See Solomon v. Commissioner, supra. Wilson, a 15-percent owner of Sierra Toyota from November 1984 to July 1985, testified that he was unaware of the oversubmits, which decreased his earnings, until he was informed of them by Kelley. When he approached Wright, he was informed that the oversubmits were going to an offshore company for Wright's retirement and that Wilson would participate in the profits to the extent of his ownership. Wilson testified that he never received *404 his share. Further, Wright told Winger that he was placing the service contract income in FIR to save on taxes. Petitioners claim that Wright relied on Mailho, Cicone, and Ashland and on the mistaken belief that he had received an opinion from Andersen in entering into the FIR transactions. Wright did not reasonably rely on a tax professional in entering into the transactions at issue and did not provide full information to all of those on whom he claimed to have relied. Further, Wright participated in the decision not to obtain an opinion from Andersen. From the evidence, we conclude that he expected an adverse opinion. Mailho did not represent himself as an expert in taxation. Prior to starting his company, Mailho had experience in computer systems, not in computation or calculation of insurance reserves. Wright did not research Mailho's credentials. Further, Mailho was the obvious promoter of the reinsurance transactions and stood to profit from their consummation. Wright received a copy of a letter wherein Mailho stated that his self-proclaimed goal was "minimizing or deferring the tax event". Therefore, it was not reasonable for Wright to rely on Mailho. Cicone informed *405 Wright that he was not an expert in insurance or insurance taxation, and he urged Wright to obtain a tax opinion at the outset of the transactions. Further, Cicone had no dealings with respect to FIR during 1984 and 1985. Because of Cicone's lack of information and expertise, Wright could not have reasonably believed that Cicone would be able to advise him adequately. Ashland did not hold himself out to be a tax or insurance expert. Ashland testified that both he and Andersen had concerns about the tax viability of the FIR transactions, including section 482 concerns. Petitioners claim that Ashland did not share these concerns with Wright. However, Ashland testified that he discussed the section 482 concerns with Wright. There was no apparent reason for Ashland to hide these concerns from Wright. It is incredible that Ashland, on his own initiative, would have implemented this sophisticated transaction to evade tax on behalf of petitioners without their full knowledge and consent. Wright approved the New England, Independent, and Yanton transactions, which had no apparent substance; was present at every meeting between Ashland and Mailho; and knew that the determination of reserves *406 for FIR was dependent on the determination of the amount of income to be diverted to FIR. Early in the trial, the Court indicated to Wright its skepticism regarding Wright's claim of reliance on professionals because of documents in the record showing that Wright had notice of infirmities in the transactions. On the last day of trial, recalled by his counsel, Wright claimed for the first time that he had to rely on and surround himself with people to take care of things for him because he had a problem comprehending and retaining things that he read. During years of criminal and civil tax investigation, no reading problem was ever disclosed by Wright. We expressly reject Wright's claim of complete reliance on others. We further reject petitioners' assertion that Wright's lack of education indicates that he did not act fraudulently. These cases are comparable to Estate of Temple v. Commissioner, 67 T.C. 143, 162 (1976). We incorporate the same analysis here. The Court there stated: [The decedent's estate] contends that * * * [the deceased taxpayer], being unversed in matters of accounting, relied totally upon * * * [the preparer] to insure the accuracy of his records and prepare *407 his tax returns. It further contends that the resultant understatements are not such as would cause * * * [the taxpayer] to be aware that his income was underreported. We cannot agree with either contention. At the outset we are not impressed with * * * [the estate's] attempt to characterize * * * [the taxpayer] as an unknowledgeable businessman. His limited formal education did not prevent him from realizing substantial amounts of income during each of the years in issue. Furthermore, the record shows that * * * [the taxpayer] had his fingers on the pulse of the financial affairs of * * * [his business].
Wright had a keen awareness in business and financial matters. He was highly successful in the car dealership business. Neither Wright's lack of education nor his alleged reading problem negate his ability to understand the fraudulent nature of his actions. Petitioners also point out that Wright's returns were signed by C.P.A.'s. Although the tax return preparers may have been aware of the oversubmits, petitioners have not demonstrated that the tax return preparers were aware that such payments were made to FIR with no underlying valid business purpose, i.e., that there were *408 no services performed by FIR in exchange for such funds and that the commissions of the service contract salespeople were reduced by the oversubmits. Thus, petitioners have not shown that the tax return preparers were fully informed regarding the FIR transactions. The record shows that Wright was aware that the oversubmit income was being diverted to FIR; that no services were performed by FIR to earn such income; that, although such income would have been fully taxable at the dealership level, FIR was not paying any tax on such income due to inflated and manufactured reserves; and that such arrangement was risky for tax purposes. Because of the pattern of understatement of income from 1983 through 1987, the general inadequacy of the FIR records, the failure to file the FIR returns for subsequent years, Wright's misleading statement to an IRS representative that he received a tax opinion, Wright's lack of credibility and implausible excuses, Wright's apparent willingness to defraud an employee with respect to the oversubmits, Wright's incriminating statements to Winger and Wilson with respect to the oversubmits, and Wright's knowledge with respect to the avoidance of tax on the oversubmits, *409 we hold that Wright's actions in causing the oversubmits to be diverted to FIR were fraudulent. We further hold that Totem Lake Suzuki, R & W Chevrolet, West Seattle Nissan, and W-T-W acted fraudulently, through their agents, with respect to the oversubmits. The actions of Wright, Mailho, and Ashland in diverting the oversubmits to FIR were fraudulent and are imputed to these dealerships. See Federbush v. Commissioner, 34 T.C. 740 (1960), affd. 325 F.2d 1 (2d Cir. 1963). For the 1983, 1984, and 1985 Wright returns and for the 1986 W-T-W return, the entire underpayments are subject to the additions to tax for fraud, except with respect to the interest portion, which is to be calculated solely on the amounts of the oversubmits. Sec. 6653(b)(1) and (2). There is insufficient evidence in the record to conclude that the underpayments for Wright's 1986 and 1987 years and for W-T-W's 1987 fiscal year that were attributable to the annuities and the excess compensation deduction were due to fraud. We therefore hold that such underpayments are not subject to the addition to tax for fraud. Respondent determined in the notice of deficiency for the Wrights that the addition to tax for negligence *410 applied on the portion of the underpayment for 1986 that was attributable to the insurance premiums ceded to FIR. Respondent determined in the notice of deficiency for W-T-W that the addition to tax for negligence applied on the portion of the underpayment for W-T-W's 1987 year that was based on the excess compensation deduction. Respondent's determination that such underpayments were due to negligence is "presumptively correct and must stand unless the taxpayer can establish that he was not negligent." Hall v. Commissioner, 729 F.2d 632, 635 (9th Cir. 1984), affg. T.C. Memo. 1982-337. Respondent alleged for the first time in the Answers that petitioners are liable, in the alternative, for additions to tax for negligence on all of the underpayments that respondent has determined are attributable to fraud. Respondent bears the burden of proof on any new matter pleaded in the Answer. Rule 142(a). Thus, with respect to underpayments, upon which negligence was asserted in the alternative to fraud, respondent bears the burden of proof. For purposes of section 6653(a) (during the years in issue), "Negligence is lack of due care or failure to do what a reasonable and ordinarily prudent *411 person would do under the circumstances." Neely v. Commissioner, 85 T.C. 934, 947 (1985) (quoting Marcello v. Commissioner, 380 F.2d 499, 506 (5th Cir. 1967)). Petitioners claim that petitioners were not negligent because Wright relied on advisers, key employees, and accountants to maintain records and because the returns of W-T-W and the Wrights were prepared and signed by C.P.A.'s. Generally, for purposes of determining the addition to tax for negligence, the duty of filing accurate returns cannot be avoided by placing the responsibility on a return preparer. Metra Chem. Corp. v. Commissioner, 88 T.C. 654, 662 (1987). However, in limited situations, taxpayers can avoid the negligence addition to tax if they have furnished all of the relevant information to a tax preparer and relied on that person's professional advice as to the proper tax treatment. Jackson v. Commissioner, 86 T.C. 492, 539-540 (1986), affd. 864 F.2d 1521 (10th Cir. 1989); Daugherty v. Commissioner, 78 T.C. 623, 641 (1982); Magill v. Commissioner, 70 T.C. 465, 479 (1978), affd. 651 F.2d 1233 (6th Cir. 1981); Pessin v. Commissioner, 59 T.C. 473, 489 (1972). For the reasons set forth in our discussion of the fraud *412 additions to tax, the Wrights are liable for the addition to tax for negligence for 1986 based on the underpayment attributable to insurance premiums ceded to FIR. Price Waterhouse reviewed Wright's compensation arrangement and signed the 1987 return of W-T-W. The "consultant fees", however, were not clearly disclosed on the return, and petitioners have not shown that those fees were disclosed to their accountants. We therefore hold that, with respect to the underpayment due to W-T-W's excess compensation deduction in 1987, petitioners were negligent to the extent of the undisclosed consultant fees. With respect to the underpayments due to the annuities, respondent has not proven that the Wrights did not reasonably rely on professional advice. Thus, with respect to the annuities, the Wrights are not liable for the negligence additions to tax. Section 6661(a) provides for an addition to tax on underpayments attributable to a substantial understatement of income tax. Sec. 6661(a). An understatement is substantial if it exceeds the greater of 10 percent of the tax required to be shown on the return or $ 5,000. Sec. 6661(b)(1)(A). An understatement is substantial for a corporation *413 (other than an S corporation or personal holding company) if the amount of the understatement exceeds the greater of 10 percent of the tax due or $ 10,000. Sec. 6661(b)(1)(B). Petitioners had substantial understatements in each of the years at issue. The section 6661 addition to tax is not applicable, however, if there was substantial authority for the taxpayer's treatment of the items in issue or if the relevant facts relating to the tax treatment were adequately disclosed on the return. Sec. 6661(b)(2)(B)(i) and (ii). Petitioners argue that there was substantial authority for the treatment on their returns of the insurance premiums ceded to FIR, the annuities, and the oversubmits. There is substantial authority for the tax treatment of an item only if the weight of the authorities supporting the treatment is substantial in relation to the weight of the authorities supporting contrary positions. Accardo v. Commissioner, 942 F.2d 444, 453 (7th Cir. 1991), affg. 94 T.C. 96 (1990); sec. 1.6661-3(b), Income Tax Regs. As we have previously concluded, the authorities relied on by petitioners do not support the positions taken on their returns. See Antonides v. Commissioner, 91 T.C. 686 (1988), *414 affd. 893 F.2d 656 (4th Cir. 1990). In order to claim adequate disclosure on a return, the disclosure must have been arranged in a manner that "reasonably may be expected to apprise the Internal Revenue Service of the identity of the item, its amount, and the nature of the potential controversy". Sec. 1.6661-4(b)(3), Income Tax Regs. There was not adequate disclosure on the returns regarding the insurance premiums ceded to FIR, the annuities, and the oversubmits. We conclude that petitioners are liable for the additions to tax under section 6661 on the understatements attributable to these items. With respect to the disallowed compensation deduction for W-T-W's 1986 and 1987 fiscal years, petitioners contend that W-T-W adequately disclosed such compensation on its returns. Respondent's determination that the deduction was not reasonable was based on the wages and consultant fees paid to Wright. The consultant fees paid to Wright were not clearly disclosed on the returns. W-T-W adequately disclosed only the wage portion of Wright's compensation on its returns. With respect to the underpayment attributable to the excess compensation deduction, petitioners are liable for the substantial *415 understatement addition to tax up to the amount of the undisclosed consultant fee. Respondent has determined that the Wrights are liable for the additional interest under section 6621(c) (formerly section 6621(d)) for 1983 through 1987 on the portions of the underpayments relating to oversubmits, interest on the FIR bank account (containing oversubmits), insurance premiums ceded to FIR, deposits to the Western United annuities, and interest earned on the annuities. Section 6621(c) applies an increased rate of interest on substantial underpayments attributable to tax-motivated transactions. Sec. 6621(c)(1). An underpayment is substantial, for purposes of this section, if it exceeds $ 1,000 and is attributable to a tax-motivated transaction. Sec. 6621(c)(2). Any sham or fraudulent transaction is considered a tax-motivated transaction. Sec. 6621(c)(3)(A)(v). Petitioners argue that none of the transactions at issue were shams or fraudulent. We do not agree. The oversubmits, the interest thereon, and the insurance premiums ceded to FIR were attributable to transactions with FIR, an entity we have found to be a sham. However, we have not found that the annuities or related interest *416 were sham or fraudulent transactions. We, therefore, sustain respondent's determinations with respect to the section 6621(c) additions to tax only with respect to the underpayments due to the oversubmits, the related interest, and the insurance premiums ceded to FIR. With respect to all of the issues discussed in this opinion, we have considered the other arguments of the parties, and they are either without merit or not necessary in view of our resolution of the issues. Decisions will be entered under Rule 155. Footnotes
1. Cases of the following petitioners are consolidated herewith: W-T-W, Inc. dba Totem Lake Ford/Toyota, docket No. 18407-90; William T. and Lynne L. Wright, docket No. 27968-90; and William T. and Lynne L. Wright, docket No. 26402-91.↩
2. Fraud is not determined against petitioner Lynne L. Wright. ↩
1. Not an alternative adjustment. Addition to tax is imposed on portion of deficiency upon which no fraud has been determined.↩
1. Not an alternative adjustment. Addition to tax is imposed on portion of deficiency upon which no fraud has been determined.